UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ APR 2 0 2016 ★

BROOKLYN OFFICE

-------------------------------------------------- X
                :

**RAMDAI CHANDRAPAUL,**         :

           Plaintiff,      :

                :

     - against -        :

                :   14 Civ. 790 (AMD) (CLP)

**CITY UNIVERSITY OF NEW YORK, ANNE**  :
**MARIE MENENDEZ, MARY ROSA, MAVIS**
**HALL, ROBERTA NORD, and DIANE B.**  :
**CALL,**
                :

         Defendants.    :

-------------------------------------------------- X

**MEMORANDUM & ORDER**

**ANN DONNELLY,** District Judge.

     The plaintiff, Ramdai Chandrapaul, brings this suit against the City University of New York (CUNY) and individual defendants in connection with her enrollment in the nursing program at Queensborough Community College (QCC)[1] and subsequent receipt of a failing grade in NU202, a second-year nursing class. The plaintiff alleges discriminatory treatment on the basis of age, sex, race, and national origin. She complains that the defendants discriminated against her in admissions, manipulated her grade on a final exam, denied her petition to retake the course, and did not conduct a fair investigation into her complaints.

     Specifically, the plaintiff alleges: 1) age discrimination in violation of the Age Discrimination Act of 1975 (Age Act); 2) sex discrimination in violation of Title IX of the Education Amendments Act of 1972 (Title IX); 3) race and national origin discrimination in violation of Title VI of the Civil Rights Act of 1964 (Title VI); 4) retaliation under Title VI; 5)

---

[1] The plaintiff did not name QCC as a defendant.

1

violation of the plaintiff's rights to due process under the Fourteenth Amendment; 6) violation of the plaintiff's Fourteenth Amendment Equal Protection rights on account of her age, sex, race, and national origin; 7) race discrimination in violation of Section 1981; 8) conspiracy in violation of Section 1985; 9) violations of New York State Executive Law Section 296; and 10) state law breach of contract. She seeks injunctive relief and damages.

The defendants moved for summary judgment pursuant to Rule 56(c). For the reasons discussed below, the defendants' motion is granted in its entirety.

## FACTS

The plaintiff is a forty-nine year old Guyanese woman of Indian origin. (Defs.' 56.1 Statement of Material Facts (56.1 Statement) ¶ 2; Pl.'s 56.1 Statement ¶ 2.) She applied for and was denied admission to the QCC nursing program for the spring of 2009. (Defs.' 56.1 Statement ¶ 5; Pl.'s 56.1 Statement ¶ 5.) It is undisputed that the plaintiff reapplied for admission to the QCC nursing program for the fall of 2009. (Defs.' 56.1 Statement ¶ 6; Pl.'s 56.1 Statement ¶ 6.) The plaintiff asserts that her application was rejected, and QCC sent her a rejection letter dated June 2, 2009. (Pl.'s Mem. of Law at 3 (ECF No. 70).)

According to the plaintiff, the QCC Vice President for Student Affairs, Ellen Hartigan, called the Nursing Department on the plaintiff's behalf. *Id.* The plaintiff alleges further that on June 8, 2009, she met with the Chairperson of the Nursing Department at QCC, Anne Marie Menendez, who, according to the plaintiff, accused her of submitting fake transcripts and told her that she should "do something more appropriate for her age," such as physical therapist training. *Id.*

Nevertheless, the plaintiff was notified of her acceptance into the fall 2009 nursing program on June 22, 2009, though she alleges that her admission letter was back-dated to June 3,

2009. *Id.* at 4. The plaintiff started QCC's Nursing Program in September of 2009. (Defs.' 56.1 Statement ¶ 7; Pl.'s 56.1 Statement ¶ 7.)

The nursing program is a curriculum within QCC, which is a two year college in the City University of New York (CUNY) system. (Defs.' 56.1 Statement ¶ 5; Pl.'s 56.1 Statement ¶ 5.) CUNY is a public university established under the Education Law of the State of New York.

The parties agree that the QCC Nursing Department distributes its policies in a handbook to all nursing students at the beginning of their program of study, and that the handbook informs students that they are responsible for knowing the information in the college catalogue, the student handbook on the college website, the Nursing Department handbook ("the handbook"), and semester course materials. (Defs.' 56.1 Statement ¶¶ 8–9; Pl.'s 56.1 Statement ¶¶ 8–9.) Further, the parties agree that the handbook describes the criteria for retention and progression in the Nursing Program. (Defs.' 56.1 Statement ¶ 10; Pl.'s 56.1 Statement ¶ 10.)

Each clinical nursing course (NU101, NU102, NU201, and NU202) includes a clinical/laboratory and a theory/lecture component. (Ex. A to Menendez Decl. at 11 (ECF No. 64-1).) A passing final grade in each of the two components is necessary to move on to the next nursing course. *Id.*

Nursing students are provided with mid-semester and end-of-semester clinical progress reports, which identify overall clinical/laboratory performance. (Ex. A to Menendez Decl. at 12 (ECF No. 64-1).) At mid-semester, students may receive ratings of "Unsatisfactory," "Needs Improvement," or "Satisfactory." *Id.* Students who receive "Needs Improvement" or "Unsatisfactory" ratings at the mid-semester evaluation are provided written guidelines on what they must do to receive a "Satisfactory" grade at the end of the semester. *Id.* End-of-semester clinical performance is rated as "Satisfactory" or "Unsatisfactory." *Id.*

In order to move on to the next course in the nursing program, a student must achieve a passing grade of 74 percent or greater on the course examinations. (Ex. A to Menendez Decl. at 11 (ECF No. 64-1).) The NU202 course manual provides that the NU202 final grade is determined by the following formula:

| | |
|---|---|
| Exam I | 20% |
| Exam II | 20% |
| Exam III | 20% |
| Final Exam[2] | 30% |
| NLN Comprehensive Psych Exam | 5% |
| NLN Diagnostic Readiness Test | 5% |
| Community Health Education Project | 4% |

(Ex. A to Rosa Decl. (ECF No. 65-1).) The handbook provides that examination grades are not official until they have been reviewed by nursing faculty. (Ex. A to Menendez Decl. at 12 (ECF No. 64-1).) Additionally, students may request a review of their individual exam answers with the instructor. *Id.* Final course grades are posted electronically. *Id.*

QCC's "Repeat Policy" is also outlined in the handbook. Specifically, "students may repeat only one nursing course (NU101, NU102, NU201, or NU202) in the Clinical Program, one time only, on a space available basis."[3] *Id.* at 11. The parties agree that if a student fails a nursing course a second time (the same course or another course), the student does not have an automatic right to retake that course. (Defs.' 56.1 Statement ¶ 35; Pl.'s 56.1 Statement ¶ 35.) It is undisputed that when a student fails a second course but wishes to continue in the Nursing

---

[2] As outlined in the NU202 course manual, if the student passes the course, the NU202 Final Exam will change to a value of 26 percent of the final grade, and the student's score on her "Health Education Project" (which is also referred to as the "Teaching Project") of 4 percent would be added to the overall grade. (Ex. A to Rosa Decl. (ECF No. 65-1).)

[3] The plaintiff disputes this, citing the defendants' 56.1 Statement ¶ 157, which shows that a student's petition to retake NU101 was denied. However, this is not inconsistent either with the defendants' representation or the handbook, which states in bold that "a repeat of NU-101 will require approval from the Nursing Department Appeals Committee." (Ex. A to Menendez Decl. at 11 (ECF No. 64-1).)

Program, the student must appeal to the Nursing Department's Grade Appeals Committee. (Defs.' 56.1 Statement ¶ 36; Pl.'s 56.1 Statement ¶ 36.)

The plaintiff took NU101 and NU102 in the fall of 2009 and the spring of 2010, respectively, and passed each with a B-. (Defs.' 56.1 Statement ¶¶ 42–43; Pl.'s 56.1 Statement ¶¶ 42–43.) In the fall of 2010, she received a failing grade of D+ in NU201. (Defs.' 56.1 Statement ¶ 44; Pl.'s 56.1 Statement ¶ 44.) The plaintiff disputes whether she was obligated to appeal the grade in order to retake the class, but regardless, she was permitted to retake NU201, and she passed with a C+ in the 2011 spring term. (Defs.' 56.1 Statement ¶¶ 45–46; Pl.'s 56.1 Statement ¶¶ 45–46.)

She also received a score of "Unsatisfactory" in her mid-semester evaluation for the clinical/laboratory component of NU201 in the fall of 2010. (Ex. F to Menendez Decl. (ECF No. 67-5).) In the associated narrative evaluation, her instructor observed that:

> It is clear that [the plaintiff]'s anxiety once again interferes with her performance at the bedside, thus causing a safety issue. When her anxiety increases, she continuously changes the subject, not allowing others to speak, while attempting to explain all her unsafe behaviors. She is receiving an[] unsatisfactory for the midsemester evalua[tion] and must perform safely under stressful situations and provide safe medication administration.

*Id.* Professor Menendez stated, and the plaintiff did not expressly dispute, that these problems were "serious, given the high-pressure nature of the work." (Defs.' 56.1 Statement ¶ 140.)[4]

---

[4] In response, the plaintiff's 56.1 Statement reads:

> Denied. Plaintiff submitted a complaint against Defendants, including Menendez, alleging that they were involved in discriminatory acts against Plaintiff including a cover-up of their actions, which included the appeals process. Chandrapaul Aff., ¶ 63. The review showed that the committee requested no documentation of Plaintiff's extenuating circumstances yet discounted her extenuating circumstances because of a lack of documentation. Left unanswered was why was Plaintiff never asked to provide faculty support or a letter of recommendation when she submitted her appeal, if that was relevant, why was she never asked to submit documentation of my extenuating circumstances, why did the committee apparently fault her lack of documentation but did not do so with respect to younger male students . . ., and why was she not treated equally with [to younger male students]. Chandrapaul Aff., ¶¶ 53-57. Also, both [the younger male students] received low passing grades in earlier courses, and were allowed to retake the course. Supplementary Chandrapaul Aff., ¶ 15.

5

The plaintiff represents that Professor Janice Molloy was her clinical instructor for the NU201 course she took in the fall of 2010 and the NU201 course she re-took in the spring of 2011. (Pl.'s Mem. of Law at 17 (ECF No. 70).) The plaintiff says that Professor Molloy "passed her with 'Satisfactory' in her clinical rotation and a glowing recommendation for proceeding to NU202."[5] (Pl.'s Mem. of Law at 17 (ECF No. 70).)

In the fall of 2011, the plaintiff was a nursing student in NU202. (Defs.' 56.1 Statement ¶ 47; Pl.'s 56.1 Statement ¶ 47.) She received a score of "Needs Improvement" in her psychology and community nursing mid-semester clinical evaluations. (Ex. F to Menendez Decl. (ECF No. 67-5).) The psychology faculty member who reviewed the plaintiff reported that her time management was deficient and that she needed to become more concise and goal-directed when reporting information and conducting assessments. (Ex. F to Menendez Decl. (ECF No. 67-5); Menendez Decl. ¶ 53 (ECF Nos. 55-6; 64).) In community nursing, the clinical professor observed that the plaintiff needed to work on completing assignments and timely submissions. (Ex. F to Menendez Decl. (ECF No. 67-5).) Professor Menendez indicated that it is "unusual" and a "serious concern" for a QCC nursing student to receive two scores of "needs improvement" in a senior-level nursing course. (Defs.' 56.1 Statement ¶ 138.)[6]

The plaintiff took her multiple-choice final examination in NU202 on December 16, 2011. (Defs.' 56.1 Statement ¶ 57; Pl.'s 56.1 Statement ¶ 57.) The test included 80 questions, each worth 1.25 points for a total possible score of 100. (Defs.' 56.1 Statement ¶ 58; Pl.'s 56.1

---

(Pl.'s 56.1 Statement ¶ 41.) (emphasis in original). The plaintiff's countervailing paragraph does not directly dispute the facts alleged by the defendants, nor does the cited exhibit undermine the credibility of Professor Menendez's representation about the seriousness of the score of "Unsatisfactory" and the associated faculty narrative.

[5] The plaintiff offers only her own affidavit in support of this representation. (Pl.'s Mem. of Law at 17 (ECF No. 70).)

[6] Here again the plaintiff's statement of fact does not refute the defendants' representation, *see* (Pl.'s 56.1 Statement ¶ 138), and the defendants supported their factual statement with admissible evidence. *See* (Menendez Decl. ¶ 54 (ECF Nos. 55-6; 64).)

Statement ¶ 58.) The examination was administered using CUNY's Blackboard program;[7] the students submitted answers to directly into the exam software. (Defs.' 56.1 Statement ¶ 59; Pl.'s 56.1 Statement ¶ 59.) The parties agree that test results are automatically graded and recorded in Blackboard's grade center. (Defs.' 56.1 Statement ¶ 62; Pl.'s 56.1 Statement ¶ 62.) Immediately upon completing the examination, the student is able to see a non-final score on Blackboard. (Pl.'s Mem. of Law at 5 (ECF No. 70).)

The parties do not agree on the score that the plaintiff received immediately after submitting her final examination. The defendants assert that the plaintiff received an unadjusted score of 67.5 percent, (Defs.' 56.1 Statement ¶ 107), while the plaintiff insists that she saw an initial score of 68.75 percent on Blackboard. (Pl.'s Mem. of Law at 5 (ECF No. 70).) The plaintiff offers no evidence to support this conclusion, and in fact, her own exhibit appears to show that *before* her grade was adjusted upwards, the plaintiff received a grade of 67.5 percent. (Pl.'s Ex. 3 (ECF No. 70-3)); *see also* (Ex. B to Caprioglio Decl. (ECF No. 69-2).) Further, the defendants submitted an uncontroverted exhibit that shows the plaintiff's final exam questions, the answers she gave for each question, whether the answer was correct or incorrect, and the points earned for each question. (Ex. A to Caprioglio Decl. (ECF No. 69-1).)[8]

---

[7] Blackboard is a web-based learning management system, which allows CUNY professors to create online tests in multiple choice or true/false formats. (Defs.' 56.1 Statement ¶ 59, 62; Pl.'s 56.1 Statement ¶ 59, 62.)

[8] In response to the defendants description of the Grade Test record of the plaintiff's NU202 final examination questions and answers, the plaintiff offers only the following unsubstantiated claims:

> Denied. (1) Defendants Hall, Menendez, and Rosa manipulated her grades on her final exam so that she failed even though she should have passed, and that Defendant Menendez stopped her final review that Defendant Rosa was conducting that would have showed that she passed her exam, Chandrapaul Aff., ¶¶ 19-36, Exhibits 3-5; (2) that Defendant Menendez once again advised Plaintiff that she should "do something more appropriate for her age" in her final meeting with her on December 22, 2011, Chandrapaul Aff., ¶¶ 37-46; (3) Defendants did not do anything to help resolve an issue Chandrapaul had with the nursing department, but instead she took every action to prevent any form of ever resolving anything with her department as was her responsibility stated in the Student's Handbook, and Defendants discredited the "Satisfactory" passing Chandrapaul got in all her clinical rotation, and even discredited the very satisfactory passing Chandrapaul got from the very reputed nursing coordinator she had as a professor after she completed the rigorous training as a student nurse with that professor, Chandrapaul Aff., ¶¶ 37-46.

(Pl.'s 56.1 Statement ¶¶ 85–92.) (emphasis in original).

The defendants represent, and the plaintiff does not adequately dispute, that Blackboard does not allow CUNY staff to change the *answers* that a student selects on an examination; an instructor may adjust the point total assigned to particular answers. (Defs.' 56.1 Statement ¶¶ 107–111.)[9] The plaintiff alleges that points were awarded improperly. For instance, in her complaint the plaintiff alleged that faculty awarded eighteen additional points to one particular white male student, to "ensure that he passed his course." Compl. ¶ 29. The plaintiff does not support this allegation with any evidence, and in fact, the allegation is absent from her summary judgment submissions.

After the NU202 students completed the examination, CUNY staff and faculty reviewed the examination statistics and looked for questions or answers that were problematic or keyed incorrectly. (Defs.' 56.1 Statement ¶¶ 63, 69, 71, 74; Pl.'s 56.1 Statement ¶¶ 63, 69, 71, 74.)[10] The review method was anonymous, so that the faculty did not know which students selected which answers to examination questions. (Defs.' 56.1 Statement ¶¶ 72, 73.)[11] The parties agree that when the faculty members identified problematic questions, they then assigned additional points and corrected the scores of the affected students. (Defs.' 56.1 Statement ¶ 83; Pl.'s Mem. of Law at 5 (ECF No. 70).)[12] The plaintiff acknowledges that the faculty review of the

---

[9] For each of the defendants' statements of fact, numbered 107 through 111, the plaintiff states in response no more than the following:

> Denied. Plaintiff's grades and times of the modifications were modified and manipulated by faculty members, including Defendants. Chandrapaul Aff., ¶¶ 23-36. Also, the Blackboard printouts do not reflect the dates and times that changes were manually made. Supplementary Chandrapaul Affidavit, ¶ 10.

(Pl.'s 56.1 Statement ¶ 109.) (emphasis in original).

[10] Though the plaintiff seems to contest the date of the faculty's review and which faculty members were involved in the exam review, she does not appear to dispute the basic premise that CUNY staff and faculty used test statistics to evaluate the exam and assign additional points. (Defs.' 56.1 Statement ¶¶ 63, 69, 71, 74; Pl.'s 56.1 Statement ¶¶ 63, 69, 71, 74.)

[11] The plaintiff does not controvert that the NU202 faculty reviewed the final examination's assessment statistics and assigned additional points without knowing which students would benefit. (Pl.'s 56.1 Statement ¶¶ 72, 73.)

[12] The plaintiff insists that Professor Dolores Weber advised her that her score would increase because faculty had erroneously keyed in wrong answers as correct for two questions, and she had actually selected the correct answers to those questions. (Pl.'s Mem. of Law at 5 (ECF No. 70).) The parties agree that the plaintiff received credit for those answers. (Defs.' 56.1 Statement ¶ 91; Pl.'s Mem. of Law at 5 (ECF No. 70).)

Assessment Statistics identified six problematic questions on the final exam. (Defs.' 56.1 Statement ¶ 74; Pl.'s 56.1 Statement ¶ 74.) She also agrees that she received credit for two additional questions, for a total of 2.5 points. (Defs.' 56.1 Statement ¶ 91; Pl.'s Mem. of Law at 5 (ECF No. 70).)

The crux of the plaintiff's allegations of grade manipulation turns on her belief that she received an initial final exam score of 68.75, and that her corrected score would be 71.25 percent after the 2.5 percent upward adjustment, which would have resulted in an overall passing grade, rounded up, of 74 percent for the course. (Pl.'s Mem. of Law at 5–6 (ECF No. 70).) The defendants assert, and the plaintiff does not adequately refute, that the Grade Details documents shows that the plaintiff's initial score was 67.5, and her adjusted score was 70 percent on the final exam. (Ex. B to Caprioglio Decl. (ECF No. 69-2).) The defendants further maintain that if her initial grade on the final exam had been anything other than 67.5, that grade would have been recorded on the Grade Details document. (Defs.' 56.1 Statement ¶ 108.)[13] Moreover, the plaintiff acknowledges that her final grade for NU202 was less than 74 percent. (Pl.'s Mem. of Law at 8 (ECF No. 70).)

Separately, the plaintiff's Teaching Project score was changed from 100 to 70 percent. (Pl.'s Mem. of Law at 6–7 (ECF No. 70).) The defendants maintain that because the plaintiff did not receive a passing grade on the NU202 exam, her teaching project grade was not counted in the calculation of her overall course grade, as outlined in the NU202 course manual. (Defs.' 56.1 Statement ¶¶ 96–97.) The plaintiff argues that she did pass the course, but does not dispute that

---

[13] The plaintiff's denial of this fact reads only: "Denied. Plaintiff's grades and times of the modifications were modified and manipulated by faculty members, including Defendants. Chandrapaul Aff., ¶¶ 23-36." (Pl.'s 56.1 Statement ¶ 108.)

if she had failed the course, the subsequent change of her teaching score would be irrelevant. (Pl.'s 56.1 Statement ¶¶ 96–97.)[14]

On December 19, 2011, the plaintiff reviewed her final examination answers with Professors Mary Rosa and Dolores Weber.[15] (Pl.'s 56.1 Statement ¶ 102.) According to the plaintiff, this review revealed that the plaintiff had answered 57 questions correctly, including the two that the faculty keyed incorrectly. (Pl.'s 56.1 Statement ¶ 102.) The parties agree that each correct answer was allotted 1.25 points; according to the plaintiff, her corrected score should have been 71.25 percent instead of 70 percent. (Pl.'s 56.1 Statement ¶ 102.) However, the plaintiff reports that her grade review was cut short by a phone call from Professor Menendez; the plaintiff argues, without any factual support, that during this phone call, Professor Menendez instructed Professor Rosa to stop the exam review and dismiss the plaintiff. (Pl.'s 56.1 Statement ¶ 102.)

On December 22, 2011, the plaintiff reports meeting with Professor Menendez, apparently at the request of QCC Associate Dean of Academic Affairs, Michele Cuomo. (Pl.'s Mem. of Law at 7 (ECF No. 70).) The plaintiff alleges that Dean Cuomo was barred from the meeting because Professor Menendez thought Dean "Cuomo's presence would infringe her 'academic freedom.'"[16] (Pl.'s Mem. of Law at 7 (ECF No. 70).) According to the plaintiff, when she asked to review her test, Professor Menendez refused, saying that the plaintiff's grade "is what [it] is." (Pl.'s Mem. of Law at 7 (ECF No. 70).) The plaintiff claims that at this meeting, Professor Menendez again told the plaintiff that she should do something "more

---

[14] The plaintiff asserts that she "passed the course, but Defendants manipulated her grade so she would fail. Chandrapaul Aff., ¶¶ 19-36, Exhibits 3-5. Accordingly, her excellent teaching score was improperly not considered." (Pl.'s 56.1 Statement ¶¶ 96–97.)
[15] Professor Weber is not a defendant in this action.
[16] It is unclear from the plaintiff's submission whose "academic freedom" would purportedly be infringed upon. (Pl.'s Mem. of Law at 7 (ECF No. 70).)

appropriate for her age," like occupational therapy or nutrition. (Pl.'s Mem. of Law at 7 (ECF No. 70).)

Thereafter, on January 3, 2012, the plaintiff appealed to the Nursing Grade Appeal Committee to allow her to retake NU202. (Defs.' 56.1 Statement ¶ 120; Pl.'s 56.1 Statement ¶ 120.) The parties agree that none of the individual defendants were members of the Grade Appeals Committee in January of 2012 and that none of the individual defendants sat in on the Grade Appeals Committee's January 10, 2012 meeting. (Defs.' 56.1 Statement ¶¶ 118, 119; Pl.'s 56.1 Statement ¶¶ 118, 119.)

In her appeal letter, the plaintiff cited certain personal and medical issues throughout the semester that had affected her test performance. (Defs.' 56.1 Statement ¶ 135; Pl.'s 56.1 Statement ¶ 135.) For example, she said that at the beginning of the semester, she had attended to her son's many medical problems, which included breathing difficulties, sleep apnea, and a falsely diagnosed brain tumor. (Ex. F to Menendez Decl. (ECF No. 67-5).)

In addition, the plaintiff said she could not prepare for the final exam because of two deaths in her family; "the traditional prayers and religious beliefs . . . performed daily" in her home prevented her for preparing properly for the exam. (Ex. F to Menendez Decl. (ECF No. 67-5).) The plaintiff submitted an addendum, in which she wrote that she had received counseling "to learn to deal" with her "personal issues." (Ex. F to Menendez Decl. (ECF No. 67-5).) The plaintiff did not append any supporting documentation or faculty support letters. (Defs.' 56.1 Statement ¶ 136.) The plaintiff says, and the defendants do not deny, that she was not asked to submit any supporting documents. (Pl.'s 56.1 Statement ¶ 131.)

It is undisputed that the Grade Appeals Committee records its recommendations and summarizes its reasons for granting or denying a student's appeal on individual fact sheets.

(Defs.' 56.1 Statement ¶ 132; Pl.'s 56.1 Statement ¶ 132.) The Committee's fact sheet for the plaintiff reads that she had "no substantial reasons for failing [NU202 in] Fall 2011," "no faculty support letters," and "poor faculty evaluations." (Ex. D to Menendez Decl. (ECF No. 67-3).) The plaintiff protests that:

> The review showed that the committee requested no documentation of Plaintiff's extenuating circumstances yet discounted her extenuating circumstances because of lack of documentation. Left unanswered was why was Plaintiff never asked to provide faculty support or a letter of recommendation when she submitted appeal, if that was relevant, why was she never asked to submit documentation of my extenuating circumstances, why did the committee apparently fault her lack of documentation but did not do so with respect to [two] younger male students . . ., and why was she not treated equally with [the two younger male students].

(Pl.'s 56.1 Statement ¶ 133.) In fact, the handbook does not explicitly require a student to append supporting documentation to a request for an appeal. (Ex. A to Menendez Decl. at 13 (ECF No. 64-1).)

The parties agree that at the next step of the process, Professor Menendez reviewed any students' appeals, their supporting documentation, their course histories, and the recommendations of the Grade Appeals Committee. (Defs.' 56.1 Statement ¶ 130; Pl.'s 56.1 Statement ¶ 130.) The plaintiff's course history demonstrated that she earned the following grades: an "A" or "A-" in English composition, two Spanish courses, sociology, and Nursing and Societal Forces, a "B+" in human growth and development, a "B-" in NU 101 and NU102, a "D+" in NU201 on her first try, and a "C+" on her second try. (Ex. F to Menendez Decl. (ECF No. 67-5).)

In addition to her grades, Professor Menendez reviewed the plaintiff's appeal letter and addendum, noting that there were no doctors' notes or other documentation to support the

appeal. (Defs.' 56.1 Statement ¶ 136.)[17]  She also reviewed all of the plaintiff's clinical

evaluations; the plaintiff received a score of "Needs Improvement" mid-semester in both

psychology and community nursing NU202 clinical evaluations. (Defs.' 56.1 Statement ¶ 137;

Ex. F to Menendez Decl. (ECF No. 67-5).)[18]  Professor Menendez likewise reviewed the

plaintiff's clinical evaluations from the fall of 2010 NU201 course, in which the evaluators

reported that the plaintiff's anxiety was interfering with her patient care and creating safety

concerns. (Defs.' 56.1 Statement ¶ 139; Ex. F to Menendez Decl. (ECF No. 67-5).)[19]  Professor

Menendez found that the Grade Appeals Committee properly denied the plaintiff's request to

retake NU202 and finalized the decision to deny the plaintiff's appeal. (Defs.' 56.1 Statement ¶

142.)[20]

Seventeen nursing students, including the plaintiff, submitted appeals to the Grade

Appeals Committee; each of those students had previously failed a clinical nursing course, either

NU101, NU102, NU201, or NU202.[21]  (Defs.' 56.1 Statement ¶¶ 122, 123; Pl.'s 56.1 Statement

¶¶ 122, 123.) Of those seventeen, two students besides the plaintiff, W.F. and H.R., appealed to

the Grade Appeals Committee to retake NU202. (Pl.'s Mem. of Law at 8–9 (ECF No. 70).) The

plaintiff says that she had a better letter grade for each semester in nursing than W.F. and H.R.

---

[17] The plaintiff does not deny that she did not submit documentation supporting her appeal; rather, she maintains that she was not asked to provide documentation. (Pl.'s 56.1 Statement ¶ 136.)

[18] The plaintiff does not deny that she received a score of "Needs Improvement," but says that another student, whose appeal to the Grade Appeals Committee was granted, also received a "Needs Improvement." (Pl.'s 56.1 Statement ¶ 137.)

[19] The plaintiff does not deny that her clinical evaluations for NU201 during the fall 2010 semester reported that her anxiety was interfering with patient care, but rather says that another student, whose appeal to the Grade Appeals Committee was granted, also received a "Needs Improvement." (Pl.'s 56.1 Statement ¶ 137.)

[20] The plaintiff argues that discriminatory animus—and not Professor Menendez's review of the plaintiff's prior performance—motivated Professor Menendez's decision to uphold the Grade Appeals Committee; however, the plaintiff does not seem to dispute either that Professor Menendez has the power to review the decision of the grade appeal committee or that Professor Menendez upheld the Committee's decision. (Pl.'s 56.1 Statement ¶ 142.)

[21] The parties agree that the Grade Appeals Committee recommended granting the appeals of eleven students and denying the appeals of the plaintiff and five other students. (Defs.' 56.1 Statement ¶ 164; Pl.'s 56.1 Statement ¶ 164.)

and that she had a higher semester GPA in the fall of 2011 than either of them. (Pl.'s Mem. of Law at 17 (ECF No. 70).)

W.F. is a 47-year-old[22] black man from Guyana. (Defs.' 56.1 Statement ¶ 157; Pl.'s 56.1 Statement ¶ 157.) At the time of his appeal, his cumulative GPA was 2.648. (Pl.'s Mem. of Law (ECF No. 82).) He received a grade of "C+" in NU101, withdrew from NU102 during his first attempt, a grade of "C" in his second attempt at NU102, a "C" in NU201 and a "C–" in NU202. (Pl.'s Mem. of Law (ECF No. 82).)

According to the Grade Appeals Committee's fact sheet, W.F.'s appeal was granted because he faced "challenging personal events." (Defs.' 56.1 Statement ¶ 144; Ex. G to Menendez Decl. (ECF No. 67-6).)[23] His appeal letter explained that he and his wife separated in 2011, that he sought counseling to deal with the resulting economic and emotional challenges, and was later hospitalized. (Defs.' 56.1 Statement ¶¶ 145, 146; Ex. H to Menendez Decl. (ECF No. 67-7).) He submitted a note from his healthcare provider confirming that he was hospitalized from January 26, 2011 to January 31, 2011. (Defs.' 56.1 Statement ¶ 146; Pl.'s 56.1 Statement ¶ 146; Ex. H to Menendez Decl. (ECF No. 67-7).) Professor Menendez noted that W.F. received "Satisfactory" assessments in all three of his NU202 mid-term clinical evaluations. (Defs.' 56.1 Statement ¶ 147; Ex. I to Menendez Decl. (ECF No. 67-8).)[24]

H.R. is a 28-year-old[25] Arab man from Saudi Arabia. (Defs.' 56.1 Statement ¶ 157; Pl.'s 56.1 Statement ¶ 157.) He appealed on the grounds that the demands of school and his job had

---

[22] W.F. was born in 1968 and is two years younger than the plaintiff. (Defs.' 56.1 Statement ¶ 157; Pl.'s 56.1 Statement ¶ 157.)
[23] The plaintiff neither denies that W.F.'s fact sheet said this nor that he did in fact face challenging personal events. (Pl.'s 56.1 Statement ¶ 144.)
[24] The plaintiff does not deny either that Professor Menendez reviewed W.F.'s clinical evaluations or that he received assessments of "Satisfactory" in all three of his NU202 mid-term clinical evaluations. (Pl.'s 56.1 Statement ¶ 147.)
[25] H.R. was born in 1988. (Defs.' 56.1 Statement ¶ 157; Pl.'s 56.1 Statement ¶ 157.)

overwhelmed him; he had lost his job and become depressed because he could not pay his bills. (Defs.' 56.1 Statement ¶ 150; Ex. K to Menendez Decl. (ECF No. 67-10).)[26] The Grade Appeal Committee observed that H.R. "has a plan of action to succeed" and "faculty support provided verbally." (Ex. J to Menendez Decl. (ECF No. 67-9).) Professor Menendez was impressed with H.R.'s letter in which he took full responsibility for failing NU202 and identified ways that he would ensure that he passed if offered the opportunity. (Defs.' 56.1 Statement ¶ 151.)[27] H.R.'s performance record included one "Needs Improvement" on his mid-semester NU202 community nursing clinical evaluation and a failing grade in NU102; his mid-semester evaluation for that course was "Satisfactory." (Defs.' 56.1 Statement ¶ 154; Ex. L to Menendez Decl. (ECF No. 67-11).) The Grade Appeals Committee recommended that both W.F. and H.R. be permitted to retake NU202, and Professor Menendez upheld those recommendations. (Defs.' 56.1 Statement ¶¶ 148, 155; Pl.'s Mem. of Law at 8 (ECF No. 82).)

Professor Menendez contacted the plaintiff and notified her of the decision to deny her appeal, which meant that she could not continue in QCC's nursing program. (Defs.' 56.1 Statement ¶¶ 163–64; Pl.'s 56.1 Statement ¶¶ 163–64.) The plaintiff acknowledges that she was upset to learn that her appeal had been rejected and that she would not be permitted to continue in the nursing program. (Defs.' 56.1 Statement ¶¶ 163–64; Pl.'s 56.1 Statement ¶¶ 163–64.)

The plaintiff then emailed Karrin Wilks, CUNY's Dean of Academic Affairs, claiming that she had failed the NU202 class by only 0.04 percent, and that she should have received a higher score and thus passed the class. (Defs.' 56.1 Statement ¶¶ 169–70; Pl.'s 56.1 Statement ¶¶ 169–70.) Dean Wilks forwarded the plaintiff's email to CUNY's Director of Student

---

[26] The plaintiff does not deny either that Professor Menendez reviewed H.R.'s appeal or that his letter said that he lost his job and became depressed. (Pl.'s 56.1 Statement ¶ 150.)

[27] The plaintiff does not dispute the truth of this statement, but rather reiterates that she was not treated equally with W.F. and H.R. (Pl.'s 56.1 Statement ¶ 151.)

Advocacy and Referral, Roberta Nord, who in turn forwarded the plaintiff's email to Ellen Hartigan, QCC's then-Vice President of Student Affairs, and asked if the plaintiff had any recourse. (Defs.' 56.1 Statement ¶¶ 169, 172; Pl.'s 56.1 Statement ¶¶ 169, 172.) Ms. Nord learned that the plaintiff's only recourse was to submit an appeal to the QCC Nursing Departments' Grade Appeals Committee and request permission to retake the course. (Defs.' 56.1 Statement ¶ 173.)[28] Ms. Nord encouraged the plaintiff to take this step. (Defs.' 56.1 Statement ¶ 174.)[29]

On January 12, 2012, Ms. Nord learned that the plaintiff's appeal to the Grades Appeal Committee had been denied. (Defs.' 56.1 Statement ¶ 175.)[30] On January 17, 2012, the plaintiff emailed Ms. Nord detailing her contentions about the exam and appeal process; Ms. Nord opened an investigation on January 19, 2012, and emailed Professor Menendez to inform her that the plaintiff had complained to the Office for Student Affairs.[31] (Defs.' 56.1 Statement ¶¶ 176–78 177; Pl.'s 56.1 Statement ¶¶ 176–78.) The plaintiff says that no one at QCC or CUNY investigated her complaint, (Pl.'s 56.1 Statement ¶ 178), but provides no evidence to support that allegation.

According to Ms. Nord, her investigation focused on whether the actions taken in connection with the plaintiff's dismissal from QCC's nursing program were arbitrary and capricious. (Defs.' 56.1 Statement ¶ 180).[32] During the investigation, Ms. Nord reviewed the

---

[28] The plaintiff does not dispute this, but rather says that her claims of discrimination were insufficiently investigated. (Pl.'s 56.1 Statement ¶ 169.)

[29] The plaintiff does not deny that Ms. Nord encouraged her to submit an appeal, and in fact, the plaintiff did appeal the decision to bar her from continuing in the nursing program. (Pl.'s 56.1 Statement ¶ 174.)

[30] The plaintiff does not expressly deny that Ms. Nord learned that the Grade Appeals Committee had denied the plaintiff's request on January 12, 2012. (Pl.'s 56.1 Statement ¶ 175.)

[31] That complaint was consistent with the plaintiff's above-described allegations and the subject-matter of this litigation.

[32] The plaintiff generally denies the defendants' representations about Ms. Nord's investigation, but fails to offer any record evidence that contradicts either the defendants' 56.1 Statement or the declarations the defendants cite in support. (Pl.'s 56.1 Statement ¶ 180.)

following documents: the plaintiff's "Grade Details" (a Blackboard document), her "Grade Assessment" for the NU202 final exam (which set forth the NU202 final exam, the plaintiff's answers to each question, and the points assigned to the plaintiff for each question), the NU202 grading scheme set forth in the NU202 course manual, the Nursing Department's repeat policy set forth in the Nursing Department's Student Handbook, the letter from the Grade Appeals Committee denying the plaintiff's appeal, emails and a handwritten list of questions from the plaintiff, two printouts of her NU202 grades on two different dates, copies of her QCC and LaGuardia Community College transcripts, her appeal and addendum to the Grade Appeals Committee, and QCC clinical evaluations by clinical nursing faculty. (Defs.' 56.1 Statement ¶ 184). She also spoke with Professor Menendez and QCC's legal counsel, Lois Florman. (Defs.' 56.1 Statement ¶ 183).

Ms. Nord's investigation revealed that the plaintiff properly received a score of final 70 out of 100 on her NU202 final exam. (Defs.' 56.1 Statement ¶ 188). The plaintiff had not included one of her wrong answers on her list of incorrectly answered questions; as a consequence, she erroneously concluded that her grade should have been higher. (Defs.' 56.1 Statement ¶ 189; Ex. B to Nord Decl. (ECF No. 61-2).) Ms. Nord found that the plaintiff's teaching score was irrelevant because she did not pass the NU202 class, and thus, the teaching score did not count in the calculation of her NU 202 grade, as explained in the NU202 course manual. (Defs.' 56.1 Statement ¶ 191.)

The parties agree, as Ms. Nord found, that the Nursing Department's Grade Appeals Committee had the discretion to permit a student to retake a nursing course a second time. (Defs.' 56.1 Statement ¶ 192; Pl.'s 56.1 Statement ¶ 192.) After review of the documentation provided by the Nursing Department, Ms. Nord concluded that the Grade Appeals Committee's

decision to deny the plaintiff's request to retake NU202 was a "tough one to make" but was not arbitrary or capricious. (Defs.' 56.1 Statement ¶ 193; Ex. D to Nord Decl. (ECF No. 61-4).) Ms. Nord found no evidence to support the plaintiff's allegations, and informed the plaintiff in a March 6, 2012 letter that she was eligible to complete her degree in another program at QCC. (Defs.' 56.1 Statement ¶ 194; Ex. D to Nord Decl. (ECF No. 61-4).)

The plaintiff also lodged an informal complaint with Mavis Hall, who was then QCC's Chief Diversity Officer in QCC's Office of Affirmative Action (AAO). (Defs.' 56.1 Statement ¶ 198; Pl.'s 56.1 Statement ¶ 198.) That office monitors QCC's equal opportunity and affirmative action programs and policies, and investigates discrimination complaints brought by staff and students. (Defs.' 56.1 Statement ¶ 196; Pl.'s 56.1 Statement ¶ 196.) The plaintiff then filed a formal complaint with the AAO on January 19, 2012. (Pl.'s 56.1 Statement ¶ 207.)

The following day, Ms. Hall emailed Professor Menendez to inform her that she had been named in a complaint received by the AAO. (Defs.' 56.1 Statement ¶ 207; Ex. B to Hall Decl. (ECF No. 63-2).) Ms. Hall informed Professor Menendez that the investigation would include a fact-finding process, involving interviews of all individuals identified in the AAO complaint. (Defs.' 56.1 Statement ¶ 208; Ex. B to Hall Decl. (ECF No. 63-2).) Further, the findings of the investigation would be submitted to QCC President Dr. Diane Call to determine what action, if any, was to be taken. (Defs.' 56.1 Statement ¶ 209; Ex. B to Hall Decl. (ECF No. 63-2).) The email included a request to discuss the plaintiff's concerns. (Defs.' 56.1 Statement ¶ 210; Ex. B to Hall Decl. (ECF No. 63-2).)

Over the course of the two-month-long investigation, Ms. Hall interviewed Professors Menendez, Weber, and Rosa. (Defs.' 56.1 Statement ¶¶ 211–12.) She also reviewed documents,

including the Blackboard "Grade Details" document, the NU202 course manual, and emails from the plaintiff, nursing faculty, and the QCC administration. (Defs.' 56.1 Statement ¶ 214.)

The parties agree that the plaintiff met with Professor Rosa and Dean Paul Jean-Pierre, Associate Dean for Student Affairs, on March 8, 2012. (Defs.' 56.1 Statement ¶ 227; Pl.'s 56.1 Statement ¶ 227.) During the ninety minute meeting, the three of them reviewed the plaintiff's exam. (Defs.' 56.1 Statement ¶¶ 231–32; Pl.'s 56.1 Statement ¶¶ 231–32.) The plaintiff represents that she raised "many concerns" during this meeting, (Pl.'s 56.1 Statement ¶ 230), but Professor Rosa says that the plaintiff appeared to have accepted that the score she received on the exam was, indeed, correct. (Defs.' 56.1 Statement ¶ 233.)

Ms. Hall concluded the investigation into the plaintiff's AAO complaint on March 19, 2012, and found no evidence to substantiate the plaintiff's allegations of discrimination. (Defs.' 56.1 Statement ¶¶ 215, 219.) Ms. Hall submitted her report to QCC President Call on March 20, 2012. (Defs.' 56.1 Statement ¶ 220; Ex. C to Hall Decl. (ECF No. 63-3).) On April 6, 2012, President Call reviewed the report and completed a form titled, "Actions Taken in Response to Discrimination/Harassment Complaint," on which she checked "No Action." (Defs.' 56.1 Statement ¶ 224; Ex. A to Call Decl. (ECF No. 62-1).)

According to the plaintiff, it was only after her attorney called Mavis Hall on April 10, 2012 to inquire about the status of the investigation that CUNY sent the plaintiff a letter informing her that her allegations of discrimination were unsubstantiated. (Pl.'s 56.1 Statement ¶ 214.) President Call represents that she sent the letter on April 9, 2012. (Defs.' 56.1 Statement ¶¶ 225–26.)

## PROCEDURAL HISTORY

The plaintiff sent a Notice of Intention to Make a Claim, dated April 10, 2012, to Chancellor Mathew Goldstein at CUNY, but there is no indication that she served it upon the United States Secretary of Health and Human Services or the Attorney General. (Ex. A to Kruk Decl. (ECF No. 59-1).) Further, the notice does not identify the alleged violation of the Age Discrimination Act of 1975, the relief sought, the court where the complaint was to be filed, or whether attorney's fees would be demanded. *Id.* The plaintiff also filed a discrimination complaint with the United Sates Department of Education on October 4, 2012 and received a final determination on November 5, 2013. (Ex. A. to Pl.'s Resp. to Order to Show Cause (ECF No. 83-1).) Thereafter, on January 31, 2014, the plaintiff mailed a second Notice of Intention to Make a Claim; this time she mailed it to QCC's Interim President, Diane Call. (Ex. B to Kruk Decl. (ECF No. 59-2).) Though the Notice includes a "Notice Mailing list," the plaintiff does not allege that the Notice was actually served upon the Secretary of Health and Human Services, the Attorney General, or other required recipients—including CUNY. *Id.*

Six days later, on February 5, 2014, the plaintiff filed her complaint in the instant lawsuit against CUNY, Professor Menendez, Professor Rosa, Ms. Hall, Ms. Nord, and Interim President Call. After discovery concluded, Judge Kuntz held a pre-motion conference in June of 2015. The case was reassigned to me in November of 2015.

The defendants now move for summary judgment. They argue that: a) the plaintiff's Section 1981, 1985, Title VI, and Title IX claims predating February 5, 2011 are barred by the statute of limitations; b) the plaintiff's claims under Title VI, Title IX, and the Age Act cannot be sustained against the individual defendants because there is no individual liability under those statutes; c) the Age Act claim should be dismissed because the plaintiff did not comply with the

statutory notice requirements; d) the plaintiff failed to raise a genuine issue of material fact as to her claim of intentional discrimination under Title VI, her retaliation claim under Title VI, her Title IX claim, her Section 1981 claim, and her claim of a violation of due process; e) the plaintiff has failed to adduce any evidence to support an equal protection claim; f) the plaintiff cannot satisfy the *Monell* standard to establish municipal liability; and g) the Court should decline to exercise supplemental jurisdiction over the plaintiff's remaining state law claims.

After the plaintiff filed her opposition and the defendants filed a reply, I permitted the plaintiff to file a sur-reply and a statement opposing the movants' 56.1 Statement of Material Facts (which the plaintiff had inadvertently excluded from her submission). Then, on March 2, 2016, I issued an order instructing the plaintiff to show cause why her Age Act claim should not be dismissed for failure to exhaust administrative remedies prior to filing her complaint. The plaintiff responded on March 18, 2016. For the reasons discussed below, I grant the defendants' motion for summary judgment in its entirety.

## DISCUSSION

### I.     Standard of Review

A district court may grant summary judgment only if the parties' submissions, in the form of deposition transcripts, affidavits, or other documentation, taken together show that there is "no genuine dispute as to any material fact," and therefore the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) & (c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). To defeat a properly supported summary judgment motion, the plaintiff must put forward similar materials setting out specific facts that demonstrate that there is a genuine issue of material fact to take to a jury. *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 373 (E.D.N.Y. 2013) *aff'd*, 578 F. App'x 34 (2d Cir. 2014).

The court is to draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). A mere "scintilla of evidence in support of the [non-movant's] position" is inadequate. *Hayut v. State Univ. of New York*, 352 F.3d 733, 743 (2d Cir. 2003) (citation omitted). Summary judgment is appropriate where there is "nothing in the record to support plaintiff's allegations other than plaintiff's own contradictory and incomplete testimony." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (citation and internal quotation marks omitted).

The Second Circuit has observed that "an extra measure of caution is merited" in granting summary judgment in a discrimination action. *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994)); *see also Zann Kwan*, 737 F.3d at 843 ("there is a need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent") (citation and internal quotation marks omitted). However, summary judgment "remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *Holtz*, 258 F.3d at 69 (citation omitted). Even in an action alleging discrimination, the plaintiff "must provide more than conclusory allegations to defeat a motion for summary judgment." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 170 (2d Cir. 2014). The opponent to summary judgment "must set forth 'concrete particulars' showing that a trial is needed." *Bacon v. Walgreen Co.*, 91 F. Supp. 3d 446, 450 (E.D.N.Y. 2015) (quoting *R.G. Grp., Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984)).

## II. Failure to Comply with Local Rule 56.1

Local Civil Rule 56.1(a) obliges a moving party to submit "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends

there is no genuine issue to be tried." Local Rule 56.1(d) requires that "[e]ach statement of material fact by a movant . . . must be followed by citation to evidence which would be admissible." Consequently, Rule 56.1 is not a vehicle for the moving party to make factual assertions unsupported by the record. *Holtz*, 258 F.3d at 74. Here, the defendants have submitted an appropriate Rule 56.1 Statement of Material Facts, which includes citations to admissible evidence.

In contrast, the plaintiff initially did not comply with Local Rule 56.1, which requires the party opposing a motion for summary judgment to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party." Local Rule 56.1(b). Ordinarily, where a party opposing a motion for summary judgment does not refute a fact set forth in the moving party's statement of material fact, that fact would be deemed admitted. *Koontz v. Great Neck Union Free Sch. Dist.*, No. 12-cv-2538-PKC, 2014 WL 2197084, at *1 (E.D.N.Y. May 27, 2014); *see also Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Nonetheless, the Court has broad discretion to "overlook a party's failure to comply with local court rules." *Holtz*, 258 F.3d at 73. Further, the district court may, as I did here, grant the non-compliant party leave to submit a 56.1 Statement. *Koontz*, 2014 WL 2197084, at *1. I therefore deny the defendants' request to treat their statement of material facts as admitted in its entirety. That, however, does not end the inquiry.

The plaintiff was obligated, in her belated 56.1 Statement, to controvert *specifically* the movant's factual allegations *and* point to admissible evidence in the record in support of any assertion that there is a dispute as to an issue of fact. *Arline v. Potter*, 404 F. Supp. 2d 521, 527 (S.D.N.Y. 2005); *see also* Local Civil Rule 56.1(b) & (d). The plaintiff submitted the following evidence only: two of her own affidavits, the June 3, 2009 letter notifying the plaintiff of her

admission into the QCC nursing program, a Blackboard print-out on which someone has hand-written calculations, page "2 of 2" of what appears to be a second Blackboard print-out, a type-written list of "New Issues Raised in subsequent correspondence," a "Grade Details" document, excerpts from the deposition of Professor Rosa, the results of the Grade Appeals for the two above-described students permitted to retake NU202, and a NU102 Clinical Progress Report for one of the students permitted to retake NU202.

Though I decline to treat the defendants' 56.1 Statement as admitted in its entirety, as identified above, I deem as admitted the defendants' factual assertions, which are supported by the record,[33] that the plaintiff disputes but does not controvert with record evidence. *See New York ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 423, 429 (S.D.N.Y. 2000) ("where a non-movant asserts that a fact claimed to be undisputed by the moving party is actually in dispute, the non-movant must support its contention with evidence from the record").

### III.    Claims Pre-Dating February 5, 2011

The plaintiff complains that the defendants violated her rights under state and federal law by attempting to prevent her admission into the QCC nursing program in 2009. The defendants move to dismiss this claim arising under Sections 1981 and 1985, Title VI, and Title IX on the ground that it is time-barred. New York State's personal injury statute of limitations of three years, *see* N.Y. C.P.L.R. § 214(5), applies to Sections 1981 and 1985, Title VI, and Title IX. *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 225 (2d Cir. 2004) ("The statute of limitations applicable to claims brought under §§ 1981 and 1983 in New York is three years."); *Paige v.*

---

[33] "Although Rule 56.1(c) provides that uncontested material facts in the moving party's statement are to be deemed admitted, in order to rely on such statements the Second Circuit requires district courts to confirm that the statements are adequately supported by citations to evidence in the record and to disregard those which are unsupported." *Pacheco v. New York Presbyterian Hosp.*, 593 F. Supp. 2d 599, 605 (S.D.N.Y. 2009) (citing *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004)).

*Police Dep't of City of Schenectady*, 264 F.3d 197, 199 n.2 (2d Cir. 2001) (same for Section 1985 claims); *Curto v. Edmundson*, 392 F.3d 502, 503–04 (2d Cir. 2004) (same for Title IX claims); *Martin v. State Univ. of N.Y.*, 704 F. Supp. 2d 202, 234 (E.D.N.Y. 2010) (same for Title VI claims).[34]

In opposition, the plaintiff maintains that her claims are not barred by the three-year statute of limitations because she has adequately alleged a "continuing violation." (Pl.'s Mem. of Law at 12–13, Nov. 13, 2015 (ECF No. 70) (citing *Ward v. Caulk*, 650 F.2d 1144, 1147 (9th Cir. 1981)).) Under the continuing violation doctrine, if a plaintiff has endured a "continuous practice and policy of discrimination, . . . the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." *Fitzgerald v. Henderson*, 251 F.3d 345, 359 (2d Cir. 2001) (citation omitted). Courts in this Circuit "consistently have looked unfavorably on continuing violation arguments . . . and have applied the theory under compelling circumstances." *Libbey v. Vill. of Atl. Beach*, 982 F. Supp. 2d 185, 212 (E.D.N.Y. 2013) (quoting *Ruane v. Cty. of Suffolk*, 923 F. Supp. 2d 454, 459 (E.D.N.Y. 2013)).

In this case, the plaintiff's claims of discrimination are based on discrete events separated by a span of more than two years, rather than a singular ongoing violation. She complains that she was twice denied admission to the QCC nursing program for unlawful reasons, before QCC admitted her in June of 2009. She alleges that more than two years later, in December of 2011,

---

[34] Claims brought under Section 1981 are generally governed by New York's three-year statute of limitations for personal injury claims. *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d at 225. However, if a claim under Section 1981 was made pursuant to the 1991 amendments, which provided for damages in cases of intentional employment discrimination, R.S. § 1977; Pub.L. 102-166, Title I, § 101, Nov. 21, 1991, 105 Stat. 1071, the claim is governed by the four-year statute of limitations set out in 28 U.S.C. § 1658(a). *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382 (2004). Even if the four-year statute of limitation were to apply, the plaintiff's claim that she was discriminated against in 2009 would still be time-barred.

personnel at QCC manipulated her score on the NU202 final examination and that her request to retake the course was denied by the Nursing Grade Appeals Committee.

Under these circumstances, the plaintiff cannot rely on a continuing violation theory of timeliness. In the first place, the purported 2009 violation did not "continue unremedied for so long as to amount to a discriminatory policy or practice." *Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994).[35] Rather, it is undisputed that QCC admitted the plaintiff to its nursing program in June of 2009. Moreover, the continuing violation exception is "usually associated with a discriminatory policy, rather than with individual instances of discrimination." *Fitzgerald*, 251 F.3d at 359. The plaintiff does not allege, and the facts do not support, that QCC's purported violations are the result of a discriminatory policy. Finally, the denials of the plaintiff's admission in 2009 were not "continuous in time" with the alleged 2011 violation. *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) ("the acts [the plaintiff] alleges to have occurred outside the limitations periods are not continuous in time with one another or with the timely acts that she has alleged; this discontinuity is fatal to [the plaintiff's] 'continuing violation' argument."). Accordingly, I grant the defendants' motion to dismiss as untimely the plaintiff's claims arising under Sections 1983 and 1985, Title VI, and Title IX, which pre-date February 5, 2011.

## IV. Claims Against Individual Defendants under Title IX, Title VI, and the Age Act,

The plaintiff brings Title IX, Title VI, and Age Act claims against individual defendants. The defendants argue that these statutes do not apply to individuals, so the claims must be

---

[35] *Fitzgerald* and *Cornwell* preceded the Supreme Court's decision in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002), which narrowed the scope of the continuing violation doctrine. However, courts in this Circuit continue to cite to *Cornwell* and its progeny for the parameters of the continuing violation doctrine, reasoning that *Morgan* abrogated *Cornwell* on other grounds. *Stamm v. New York City Transit Auth.*, No. 04-cv-2163-SLT-JMA, 2013 WL 244793, at *8 n.1 (E.D.N.Y. Jan. 22, 2013) (collecting cases).

dismissed as against the individual defendants as a matter of law. I address each Act in turn, and, as set out below, I hold that there is no individual liability under Title IX, Title VI, or the Age Act.

Title IX provides, in relevant part, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C.A. § 1681(a). In other words, Title IX prohibits education programs that receive federal funding from discriminating against students on the basis of gender. Only institutional recipients of federal funds may be held liable under Title IX; individuals cannot be held liable. *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("Title IX reaches institutions and programs that receive federal funds, 20 U.S.C. § 1681(a), which may include nonpublic institutions, § 1681(c), but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals."); *see also Romero v. City of New York*, 839 F. Supp. 2d 588, 617 (E.D.N.Y. 2012) (finding "no reason to depart from the well-established authority that there is no individual liability under Title IX").

Like Title IX, there is no individual liability under Title VI. Title VI states that "[n]o person . . . shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Pursuant to Title VI, the appropriate defendant is an entity that receives federal funding—not an individual. *Kelly v. Rice*, 375 F. Supp. 2d 203, 208 (S.D.N.Y. 2005) (collecting cases); *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 364 (N.D.N.Y. 2014) *reconsideration denied*, No. 5:14-cv-322-GTS-ATB, 2015 WL 1040172 (N.D.N.Y. Mar. 10, 2015); *Cohen v. Brookwood Childcare Agency's Employees*, No.

01-CV-162-FB, 2001 WL 1646529, at *2 (E.D.N.Y. Dec. 14, 2001) ("Similar to Title VII, individuals are not liable under Title VI."); *see also Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) ("the remedial provisions of Title VII, including § 2000e–5, do not provide for individual liability.").

The language and structure of the Age Act parallel that of Title IX and Title VI. Under the Age Act, "no person . . . shall on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any program or activity receiving Federal financial assistance." 42 U.S.C.A. § 6102. The Act defines "program or activity" to encompass educational institutions.[36] The Act does not expressly provide for individual liability. *See Robinson v. Burlington Cty. Bd. of Soc. Servs.*, No. CIV.A. 07-2717 NLH, 2008 WL 4371765, at *7 (D.N.J. Sept. 18, 2008) (dismissing claim Age Act claims against individual defendants since "they are not alleged to be, and there is no basis to infer them as, recipients of federal funding from the federal government."). I hold that, like other federal anti-discrimination statutes, the Age Act precludes individual liability. *See, e.g., Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir.2001) (Title II of the Americans with Disabilities Act does not provide "for individual capacity suits against state officials."); *Morales v. New York*, 22 F. Supp. 3d 256, 271 (S.D.N.Y. 2014) (there is no individual liability under the Americans with Disabilities Act); *Cherry v. Toussaint*, 50 F. App'x 476, 477 (2d Cir. 2002) (Age Discrimination in Employment Act "precludes individual liability."); *Garibaldi v. Anixter, Inc.*, 407 F. Supp. 2d 449, 451 (W.D.N.Y. 2006) ("[T]here is no individual liability under *any* of the federal anti-discrimination statutes, including Title VII, the ADA, and the ADEA.").

---

[36] 42 U.S.C. § 6107(4)(B)(i) defines "program or activity" as all of the operations of—a college, university, or other postsecondary institution, or a public system of higher education.

28

Citing *Romero*, 839 F. Supp. 2d at 618, the plaintiff argues incorrectly that "individuals may be sued *under these statutes* in their official capacity as long as plaintiff establishes that the individuals acted pursuant to a policy or custom." (Pl.'s Mem. of Law at 14, Nov. 13, 2015 (ECF No. 70) (emphasis added).) As an initial matter, *Romero* stands for the opposite proposition: "[n]umerous district courts in the Second Circuit . . . have held that there is *no individual liability* under Title IX." *Romero*, 839 F. Supp. 2d at 616–17 (emphasis added). It seems that the plaintiff conflates individual liability under the federal discrimination statutes with official capacity liability under Sections 1981 and 1983. *See id.* at 618 ("[W]hen the defendant sued for discrimination under § 1981 or § 1983 is a municipality—or an individual sued in his official capacity, the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom."). Regardless, as discussed above, the federal discrimination statutes preclude individual liability, and thus the defendants' motion for summary judgment is granted as to the claims against the individual defendants under Title IX, Title VI, and the Age Act.

## V. Age Discrimination Act of 1975[37]

Section 6102 of the Age Discrimination Act of 1975 prohibits discrimination on the basis of age under any program that receives federal financial assistance. 42 U.S.C. § 6102. This

---

[37] Pursuant to Section 6104(f), a plaintiff alleging a claim pursuant to the Age Act must first exhaust administrative remedies. *Esposito v. Hofstra Univ.*, No. 11-cv-2364, 2012 WL 607671, at *4 (E.D.N.Y. Feb. 24, 2012); 42 U.S.C. § 6104(f). Specifically, a plaintiff may only commence an action in court after a period of "180 days from the filing of an administrative complaint during which time the Federal department or agency makes no finding with regard to the complaint, or upon the day that the Federal department or agency issues a finding in favor of the recipient of financial assistance, whichever occurs first." 42 U.S.C. § 6104(f). The plaintiff's failure to plead compliance with the Act's requirement that she exhaust administrative remedies is grounds for dismissal. *Morales v. New York*, 22 F. Supp. 3d 256, 271 (S.D.N.Y. 2014). Out of an abundance of caution, I ordered the plaintiff to show cause why her Age Act claim should not be dismissed for failure to exhaust administrative remedies. In response, the plaintiff demonstrated that she filed a discrimination complaint with the United Sates Department of Education on October 4, 2012 and received a final determination on November 5, 2013. (Pl.'s Response to Order to Show Cause at 3 (ECF No. 83).) Because it appears that the plaintiff actually exhausted administrative remedies (though she failed to plead that she had), I decline to dismiss her Age Act claims on this ground.

includes educational institutions receiving federal funding. *Esposito v. Hofstra Univ.*, No. 11-cv-2364, 2012 WL 607671, at *4 (E.D.N.Y. Feb. 24, 2012) (citing *Maloney v. Soc. Sec. Admin.*, 517 F.3d 70, 74 (2d Cir. 2008)); 42 U.S.C. § 6107(4).

However, under Section 6104(e)(1) and (2), the plaintiff must comply with statutory notice requirements before beginning a lawsuit. In particular, a plaintiff must provide notice of the action by registered mail to the U.S. Secretary of Health and Human Services, the U.S. Attorney General, and all "person[s] against whom the action is directed" at least 30 days before commencing an action under the Age Act. *See* 42 U.S.C. § 6104(e)(1). This 30-day notice must set forth the alleged violation of the Age Act, the relief required, the court in which the action shall be brought, and whether attorney's fees will be demanded. *See* 42 U.S.C. § 6104(e)(2).

"Absent compliance with these prerequisites, the court lacks subject matter jurisdiction" over the plaintiff's claims under the Age Act. *Hilow v. Rome City Sch. Dist.*, No. 91-cv-567, 1994 WL 328625, at *5 (N.D.N.Y. June 29, 1994); *see also Curto v. Smith*, 248 F. Supp. 2d 132, 145 (N.D.N.Y. 2003) *aff'd in part, appeal dismissed in part sub nom. Doe v. Anonymous Unnamed Sch. Employees & Officials of Cornell Univ. Coll. of Veterinary Med.*, 87 F. App'x 788 (2d Cir. 2004) and *aff'd*, 93 F. App'x 332 (2d Cir. 2004). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3). That is because "[j]urisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *In Touch Concepts, Inc. v. Cellco P'ship*, 788 F.3d 98, 101 (2d Cir. 2015) (quoting *Ex parte McCardle*, 74 U.S. 506, 514 (1868)).

Here, the plaintiff sent two different notices before bringing suit, but neither of them complied with the statutory requirements. The first notice, dated April 10, 2012 ("April 2012

Notice"), failed to meet the requirements of § 6104(e)(1) because there is no evidence in the record that the notice was served upon the United States Secretary of Health and Human Services or United States Attorney General. The April 2012 Notice was also deficient because it did not identify the alleged violation of the Age Act, the relief sought, the court where the complaint was to be filed, or whether attorney's fees would be demanded. *See* 42 U.S.C. § 6104(e)(2).

The plaintiff's second notice, dated January 31, 2014 ("January 2014 Notice"), did not comply with the 30-day advance notice requirements set forth in 42 U.S.C. § 6104(e)(1) because the notice was served only four days before the plaintiff filed her complaint. Moreover, like the April 2012 Notice, there is no evidence in the record that the January 2014 Notice was served upon the United States Secretary of Health and Human Services, the United States Attorney General, or other required recipients, such as CUNY.

Accordingly, because the plaintiff failed to comply with these statutory notice requirements, her Age Act claim are dismissed. *See Esposito*, 2012 WL 607671, at *4 (dismissing plaintiff's Age Act claims for failure to comply with the statutory notice requirements); *see also Hilow*, 1994 WL 328625, at *5 (absent compliance with the statutory notice requisites, the court lacks subject matter jurisdiction); *Curto*, 248 F. Supp. 2d at 145 ("a plaintiff must exhaust administrative remedies set forth in 42 U.S.C. § 6104," as "[t]he district court lacks subject matter jurisdiction over the suit if these prerequisites are not fulfilled."); *Stoner v. Young Concert Artists, Inc.*, No. 10-cv-8025-RPP, 2011 WL 781941, at *4 (S.D.N.Y. Mar. 7, 2011) (dismissing Age Act claim for failure to comply with 30 day notice requirement).

## VI.  Title VI and Title IX: Evidence of Intentional Discrimination[38]

It is unlawful for an education program receiving Federal financial assistance to exclude

or otherwise discriminate against an individual because of her "race, color, or national origin"

(Title IX), 42 U.S.C. § 2000d, or on the basis of sex (Title IX).  20 U.S.C.A. § 1681.[39]  The

plaintiff alleges the same set of facts in support of both her claim of discrimination under Title

VI and under Title IX.[40]  The defendants assert that the plaintiff has failed to raise a genuine

issue of material fact as to discrimination under either statute.

In order to state a claim for discrimination under Title VI or Title IX, the plaintiff must

show that the defendant discriminated against her, that the discrimination was intentional, and

that the discrimination was a motivating factor for the defendant's actions.  *Tolbert v. Queens*

*Coll.*, 242 F.3d 58, 69 (2d Cir. 2001) (Title VI); *see also Yusuf v. Vassar Coll.*, 35 F.3d 709, 714

(2d Cir. 1994) (Title IX bars a university from taking adverse action against a student, "where

gender is a motivating factor in the decision").  Thus, a "disparate treatment claim cannot

succeed" unless the plaintiff's "protected trait actually played a role in" and had a "determinative

influence" on the adverse action.  *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993); *see*

*also Koumantaros v. City Univ. of New York*, No. 03-cv-10170-GEL, 2007 WL 840115, at *7

---

[38] As addressed above, the plaintiff's Age Act claim is dismissed, I therefore do not address whether the plaintiff
raises a genuine issue of material fact as to her allegation of discrimination on the basis of age.

[39] Title VI covers only those claims of discriminatory conduct where "federal funding is given to a non-federal
entity which, in turn, provides financial assistance to the ultimate beneficiary." *Soberal-Perez v. Heckler*, 717 F.2d
36, 38 (2d Cir. 1983).  There is no dispute that CUNY, a non-federal entity, receives federal funding.  *See*
*Koumantaros v. City Univ. of New York*, No. 03–cv–10170-GEL, 2007 WL 840115, at *13 n.8 (S.D.N.Y. Mar. 19,
2007).  The parties do not address whether the plaintiff is a recipient of financial aid.  For purposes of this motion, I
assume that she is.

[40] Because of this, and because Title IX mirrors the substantive provisions of Title VI, *Yusuf v. Vassar Coll.*, 35 F.3d
709, 714 (2d Cir. 1994), I address together the defendants' arguments that: 1) the plaintiff fails to raise a genuine
issue of material fact as to her Title VI discrimination claim, and 2) the plaintiff fails to raise a genuine issue of
material fact as to her Title IX claim.

(S.D.N.Y. Mar. 19, 2007) ("to be cognizable under Title VI, defendant's discriminatory intent must 'actually play[ ] a role in' and have a 'determinative influence' on the adverse action.").

In deciding a motion for summary judgment in a race or sex discrimination case such as this, where there is no direct evidence of discriminatory conduct, courts apply the three-part burden shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Jacques v. Adelphi Univ.*, No. 10-cv-3076, 2011 WL 6709443, at *2 (E.D.N.Y. Dec. 19, 2011) (applying *McDonnell Douglas* in Title VI case) (collecting cases); *Brierly v. Deer Park Union Free Sch. Dist.*, 359 F. Supp. 2d 275, 290 (E.D.N.Y. 2005) (applying *McDonnell Douglas* in Title IX case) (collecting cases); *see also Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (applying *McDonnell Douglas* burden shifting framework in a Title VII sex discrimination case "where there is no direct or overt evidence of discriminatory conduct").

To establish a *prima facie* case of discrimination in an education program, the plaintiff must show that: 1) she is a member of a protected class; 2) she suffered an adverse action in pursuit of her education by the defendant; 3) she was treated differently from similarly situated students who are not members of the protected class; and 4) she was qualified to continue in her educational pursuit. *Jacques*, 2011 WL 6709443, at *3; *Koumantaros*, 2007 WL 840115, at *8. It is undisputed that the plaintiff can establish the first two elements of her *prima facie* case of discrimination. Namely, as a Guyanese Indian woman, the plaintiff is a member of protected classes and she suffered an adverse action in pursuit of her education. The defendants argue that the plaintiff cannot establish either that she was treated differently from similarly situated students who are not members of the protected classes or that she was qualified to continue in QCC's nursing program.

If the plaintiff demonstrates a *prima facie* case, then there is a presumption of discrimination, in which case, the defendant must rebut that presumption by articulating a legitimate and non-discriminatory reason for its conduct. *Id.*; *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (2000). If the defendant states such a reason, the plaintiff must then "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42. For the action to survive summary judgment, it is not sufficient to disbelieve the defendant; a reasonable jury must also be able to believe the plaintiff's explanation of intentional discrimination. *See id.* ("To get to the jury, '[i]t is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.'").

The plaintiff identifies a number of incidents that she contends are either direct evidence of discriminatory motive or demonstrate that she was treated differently than similarly situated students. I discuss them in chronological order.

The plaintiff first complains that CUNY manipulated her grade on her NU202 final exam. She says that when she submitted her final exam on Blackboard, she saw a grade of 68.75 percent, rather than the grade of 67.5 percent recorded on the Blackboard Grade Detail document. A searching review of the documents related to the plaintiff's performance on the NU202 final exam, however, reveals no evidence to support the plaintiff's claim. To the contrary, the plaintiff's own Exhibit 3 indicates that when she completed the exam, the software recorded a score of 67.5. Further, the report of the exam questions, the plaintiff's answers, and the points awarded—read alongside the plaintiff's emails to QCC staff—demonstrate that the plaintiff's certainty that she answered 55 questions correctly (resulting in an initial score of 68.75) was the result of her own mathematical error. No reasonable jury could find that CUNY

34

or its personnel manipulated the plaintiff's grade on the NU202 final examination. Thus, the accusation that the plaintiff's final exam score was manipulated does not establish a *prima facie* case of race or sex discrimination for purposes of Title VI or Title IX.

The plaintiff also alleges that CUNY staff awarded eighteen additional points on another NU202 exam to one particular white male student, to ensure that he passed the course, while the plaintiff received a failing grade. The plaintiff does not supply any admissible evidence to support this claim. *See D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998) ("The non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful."). In short, the plaintiff's speculation that other students received unjustified bonus points is insufficient evidence upon which a jury could reasonably conclude that white or male students were treated differently from the plaintiff.

The plaintiff's assertion that the change to her teaching project score evidences discrimination similarly fails. The parties agree that QCC changed her teaching grade from 100 to 70 on the Blackboard system. However, the NU202 Course Manual clearly states that students must successfully pass the NU202 exams with a final averaged grade of 74 percent in order to pass the course; once the student passes the course, the health education project counts for 4 percent of the student's final grade. The plaintiff acknowledges that her grade for NU202 was less than the 74 percent. Consequently, any change in her teaching score could not have given rise to her dismissal from the nursing program. *See McLee v. Chrysler Corp.*, 109 F.3d 130, 136 (2d Cir. 1997) (granting motion for summary judgment where inference of discrimination urged by the plaintiff was "foreclosed by facts he does not dispute"). Nor is there any evidence in the record that the change to the teaching score was due to discrimination.

Accordingly, the change to the plaintiff's teaching project score does not demonstrate a *prima facie* case for race or sex discrimination.

Further, the plaintiff claims that the Grade Appeal Committee and Professor Menendez discriminated against her when they denied her the opportunity to retake NU202. With respect to this allegation, she asserts that there is a genuine issue of material fact as to the third prong of the *prima facie* case of discrimination in an education program—that she was treated differently from similarly situated students who are not members of her protected classes. *Jacques*, 2011 WL 6709443, at *3.

In support of this claim, she points to two other students who petitioned to retake NU202.[41] Those students, W.F. and H.R., like the plaintiff, were enrolled in NU202 in the fall of 2011. They were thus subject to the same criteria for retention and progression in the QCC nursing program, as outlined in the handbook. Further, like the plaintiff, they had previously failed a clinical nursing course, retaken it, and passed. And, like the plaintiff, they failed NU202 but wished to remain in the nursing program, so they, like the plaintiff, submitted a request to retake the course to the Grade Appeals Committee. The same committee members reviewed the plaintiff's appeal and those of W.F. and H.R. They were, thus, "similarly situated in all material respects" to the plaintiff. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000); *cf. Patterson v. City Univ. of New York*, No. 12-cv-6300-ARR-LB, 2014 WL 3511048, at *5 (E.D.N.Y. July 14, 2014) (students who took materially different exams during different years were not similarly situated in all material respects). The plaintiff was obviously treated

---

[41] In her opposition to summary judgment, the plaintiff makes no argument related to the other fourteen students who petitioned to retake a difference clinical nursing course. I therefore do not address those students in detail. However, I note that it is likely that students who requested to retake a different nursing course, and not NU202, were not similarly situated to the plaintiff in all material respects. *See Patterson v. City Univ. of New York*, 2014 WL 3511048, at *5 (students who took materially different exams during different years were not similarly situated in all material respects).

differently from W.F. and H.R.; their request to retake NU202 was granted while the plaintiff's request was denied.

In order to assert that this difference in treatment establishes a *prima facie* case of discrimination, the individuals treated differently must not be members of the plaintiff's protected classes. She claims that she was discriminated against because she is of Indian origin, from Guyana, and female. By comparison, W.F. is a black man from Guyana, and H.R. is an Arab man from Saudi Arabia.

The plaintiff has raised a genuine issue of material fact for purposes of establishing a *prima facie* case of gender discrimination. W.F. and H.R. were men, similarly situated but permitted to retake NU202, while the plaintiff was not allowed to do so. *See Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 63 (2d Cir. 1997) (woman may prove inference of discrimination by showing similarly situated men were treated differently).

The plaintiff does not assert, and the record evidence does not suggest, particularized prejudice against either people of Indian origin or people from Guyana. Instead, the plaintiff seems to allege generalized hostility against her. For purposes of this decision, I assume that the plaintiff has raised a genuine issue of material fact as to whether W.F. and H.R. are not in the plaintiff's protected class for purposes of Title VI. *Cf. Patterson v. City Univ. of New York*, 2014 WL 3511048, at *5 ("Plaintiff fails to establish a claim of racial discrimination because half of the students who allegedly received preferential treatment were members of his protected class.").

Finally, in order to establish a *prima facie* case for discrimination, the plaintiff must be qualified to continue in her educational pursuit. *Jacques*, 2011 WL 6709443, at *3. The plaintiff has put forward some evidence suggesting that there is a genuine issue of material fact on her

educational qualifications. She represents that she Professor Molloy gave a "glowing" recommendation, which appears nowhere in the record, that she move on to NU-202. She had a better letter grade for each semester in nursing than W.F. and H.R. (excluding the courses that she failed), and she had a higher semester GPA in the fall of 2011 than either of them. Further, her course history suggests that she earned a grade of "A" or "A-" in English composition, two Spanish courses, sociology, and a course titled Nursing and Societal Forces. She received grades of "B-" in NU101 and NU102, and passed NU201 on the second try with a grade of "C+". I find this evidence adequate to raise a genuine issue of material fact as to whether the plaintiff is qualified to continue to pursue her nursing degree.

Under the burden-shifting framework, once the plaintiff establishes a *prima facie* case for discrimination, the defendants must show that there was some legitimate, non-discriminatory reason for the defendants' actions—here, the different treatment of the plaintiff from W.F. and H.R.

In this case, the Grade Appeals Committee recommended that the plaintiff's appeal be denied because she provided "no substantial reasons for failing" NU 202, did not provide "faculty support letters" and had "poor faculty evaluations." The plaintiff challenges the legitimacy of the decision of the Grade Appeals Committee on several grounds. She complains that she had extenuating circumstances but that the Committee did not request any documentation. Further, she says that she was never told to obtain faculty support, which she claims she could have done. She asserts that she had a higher grade point average and better performance generally in nursing courses. In isolation, the Committee's justifications for barring the plaintiff from retaking NU202 meet the defendant's burden of production of legitimate and non-discriminatory reasons for the defendant's conduct.

However, it is a slightly more nuanced question whether the Committee's decision—to permit W.F. and H.R. to retake NU202, while denying the plaintiff the same opportunity—was legitimate. The plaintiff points out that H.R. also produced no supporting documentation. Unlike the plaintiff, however, H.R. received only one "Needs Improvement" on the mid-semester evaluation, and H.R. encouraged the Grade Appeals Committee to ask his professors about his performance. From the facts sheet, it appears that once the committee did so, faculty provided support for H.R.'s petition to retake NU202. The plaintiff also objects to the decision to permit W.F. to retake NU202. The Committee noted that he had experienced "challenging personal events." While the plaintiff also asserts that she faced extenuating circumstances, she, unlike W.F. provided no documentation corroborating her medical treatment. These differences in the appeals submitted to the Committee make its action legitimate and non-discriminatory.

In reviewing the Grade Appeals Committee's recommendation, Professor Menendez gave the following reasons for upholding the Committee's decision: the plaintiff had not included any documentation of the personal issues in her appeal letter, she received scores of "Need Improvement" in her psychology and community nursing mid-semester clinical evaluations, and her fall 2010 mid-semester clinical evaluation for NU201 said that the plaintiff's problems with anxiety had interfered with her care of patients and created safety concerns. These are legitimate, non-discriminatory reasons for the defendants' actions.

The plaintiff protests that she had higher grades in each of her nursing courses and that she had an overall better GPA for the 2011 fall semester. While true, that fact does not render either the Committee's or Professor Menendez's assessments of the differences between the students' appeals illegitimate or discriminatory. Their decisions involved the "subjective judgment of professional educators," and they are "afforded considerable deference when

making decisions concerning academic standards." *Ward v. New York Univ.*, No. 99-cv-8733-RCC, 2000 WL 1448641, at *3 (S.D.N.Y. Sept. 28, 2000); *cf. Jacques*, 2011 WL 6709443, at *5 ("judicial restraint should be exercised when considering whether to interfere with the academic decisions of educational institutions"). Anti-discrimination statutes, like Title IX, do not prohibit differential treatment of students, but rather prohibit differential treatment on the basis of sex, race, national origin, or age. *See Koumantaros*, 2007 WL 840115, at *10 n.22.

Because the defendants raised a legitimate, non-discriminatory reason for the different treatment of similarly situated individuals, the burden shifts back to the plaintiff to demonstrate a genuine issue of material fact that the defendants' reason was pretextual. This the plaintiff did not do. In order to survive a motion for summary judgment, the plaintiff needed to come forward with "at least some credible evidence" that the defendants' actions were motivated by ill-will. *Grillo v. New York City Transit Auth.*, 291 F.3d 231, 234 (2d Cir. 2002). But instead, the plaintiff has done "little more than cite to [her alleged] mistreatment and ask the court to conclude that it must have been related" to her protected classes. *Id.* (citation omitted). This is not sufficient. *Id.*; *see also Edwards v. Ctr. Moriches Union Free Sch. Dist.*, 898 F. Supp. 2d 516, 551 (E.D.N.Y. 2012) (the fact that a plaintiff is of a different national origin, standing alone, does not support an inference that the defendants took actions against her because of her national origin); *cf. Jacques*, 2011 WL 6709443, at *4–5 (a rational jury could find that the plaintiff was unlawfully discriminated against, where the students tended to take seats along racial lines, and the plaintiff submitted affidavits from other students stating that the instructor pointed out answers during examinations to students on the white side of the room of the classroom, but not to the students of color).

The circumstances of the plaintiff's release from the QCC nursing program are consistent with the requirements for retention and progression outlined in the handbook. The decision not to allow the plaintiff to retake NU202 and continue in the nursing program is supported by legitimate concerns about the plaintiff's aptitude. That plaintiff received two NU202 mid-semester evaluations of "Needs Improvement," the lack of faculty support for her retention, and the mid-semester review identifying her as a safety risk to patients all demonstrate that neither her gender nor her race nor her national origin were a factor in the decision to bar her from retaking NU202. Though she asserts that the justifications offered by the defendants are pretextual, she has failed to offer any proof to buttress that claim. Viewing all the evidence in the light most favorable to the plaintiff, no reasonable jury could find that the defendants' decision to dismiss her from the nursing program was motivated by gender bias or by racial animus. *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 718–19 (2d Cir. 1994). Accordingly, the plaintiff's claims of race and national origin discrimination under Title VI and her claim of sex discrimination under Title IX are dismissed.

## VII.    Section 1981[42]

Sections 1981 and 1985 were enacted to protect individuals against discrimination based on race or national origin.  In particular, Section 1981 was meant to protect a person's right to be free from discrimination in making and enforcing contracts.  *Gibbs-Alfano v. Burton*, 281 F.3d 12, 16 (2d Cir. 2002).  Section 1981 provides, in relevant part: "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to . . . the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

The plaintiff alleges that "CUNY was under a contractual obligation that it would measure Plaintiff's performance according to the same grading criteria, competencies and standards, as it would measure the performance of all other students in her program." Compl. ¶ 78.  Under New York law, an implied contract arises when a student enrolls at a college.  *Tripp*

---

[42] The plaintiff failed to raise a genuine issue of material fact as to her claims of race discrimination under Sections 1981 and 1985.  Though I do not decide the issue, at least partial relief may have been available to the defendants on other grounds.  Under the Eleventh Amendment, "nonconsenting States may not be sued by private individuals in federal court," *Bd. of Trustees of Univ. of Alabama v. Garrett*, 531 U.S. 356, 363 (2001), and states are immunized from liability under Sections 1981 and 1985 on that basis.  *Wang v. Office of Prof'l Med. Conduct, N.Y.*, 354 F. App'x 459, 460 (2d Cir. 2009) (Section 1981 claim precluded by Eleventh Amendment immunity); *Scaglione v. Mamaroneck Union Free Sch. Dist.*, 47 F. App'x 17, 18 (2d Cir. 2002) (Section 1985 claims are barred against the State under Eleventh Amendment immunity).  This guarantee extends to "entities considered arms of the state." *Clissuras v. City Univ. of New York*, 359 F.3d 79, 81 (2d Cir.) *supplemented sub nom. Clissuras v. City of Univ. of New York*, 90 F. App'x 566 (2d Cir. 2004).  The Second Circuit has determined that CUNY *senior* colleges are arms of the state for purposes of Eleventh Amendment immunity.  The immunity issue is not as well settled for *community* colleges like QCC.  *Gengo v. City Univ. of New York*, No. 07-cv-681-KAM-JMA, 2010 WL 6372012, at *5 (E.D.N.Y. Dec. 2, 2010) *report and recommendation adopted*, No. 07-cv-681-KAM-JMA, 2011 WL 1204716 (E.D.N.Y. Mar. 29, 2011) *aff'd*, 479 F. App'x 382 (2d Cir. 2012); *see also Manolov v. Borough of Manhattan Cmty. Coll.*, 952 F. Supp. 2d 522, 535 (S.D.N.Y. 2013) (Eleventh Amendment does not bar suit against Borough of Manhattan Community College; New York City bears the financial responsibility for judgments against CUNY community colleges); *Moche v. City Univ. of New York*, 781 F. Supp. 160, 166 (E.D.N.Y. 1992) *aff'd sub nom. Moche v. City Univ.*, 999 F.2d 538 (2d Cir. 1993) (Eleventh Amendment is inapplicable to QCC; "[t]he substantial local supervision over and control . . ., taken in connection with the City's indemnification for all judgments, indicates that the Eleventh Amendment is inapplicable to [QCC and its physics department].")  Here, the plaintiff named CUNY—not QCC—in her complaint, but the heart of her allegations are against QCC.  Because QCC is a community college in the CUNY system, because the defendants have not moved to dismiss the QCC-specific claims against CUNY, and because the plaintiff's claims under Sections 1981 and 1985 do not survive summary judgment, I decline to decide whether the plaintiff's Sections 1981 and 1985 actions are barred by sovereign immunity under these circumstances.

*v. Long Island Univ.*, 48 F. Supp. 2d 220, 224 (E.D.N.Y.) *aff'd*, 201 F.3d 432 (2d Cir. 1999). The implicit agreement is that the institution will act in good faith toward the student, and the student will fulfill the college's academic requirements and "comply with its ethical, procedural, and other standards." *Id.* at 224.

Like Title VI, Section 1981 demands that the plaintiff show, among other things, that the defendant discriminated against her on the basis of race, that the discrimination was intentional, and that the discrimination was a "substantial" or "motivating factor" for the defendants' actions. *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001); *see also Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d at 226–27 ("a plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional.")

In the context of a Section 1981 claim where the plaintiff relies on indirect evidence of discriminatory intent, courts apply the *McDonnell Douglas* burden-shifting framework at summary judgment. *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010). For the reasons outlined in the discussion of the plaintiff's Section VI claim, the plaintiff has not adduced sufficient evidence to demonstrate that the legitimate, non-discriminatory reasons given by the defendants for their decision to bar the plaintiff from retaking NU202—while permitting W.F. and H.R. to do so—were pretextual.

It was the role of the nursing program, its faculty, and its staff to assess the safety of students' patient care during laboratory/clinicals and the adequacy of their performance on examinations. The plaintiff has not provided factual support to establishing that this decision to deny her application to retake a nursing course and to dismiss her from the nursing program violated her civil rights. *See Tripp.*, 48 F. Supp. 2d at 223–24 ("Courts reviewing substantively a professor's academic judgment owe great deference to that judgment.").

## VIII.  Section 1985[43]

Section 1985 prohibits people from "conspiring to deprive individuals of equal protection of the laws or of equal privileged and immunities under the laws." *Gibbs-Alfano*, 281 F.3d at 16; 42 U.S.C. § 1985.  The plaintiff's claim under Section 1985 fails as a matter of law, because absent an allegation of participation by external parties, the claim is barred by the intra-corporate conspiracy doctrine.  As a general matter, "officers, agents, and employees of a single corporate entity are legally incapable of conspiring together." *Talley v. Brentwood Union Free Sch. Dist.*, 728 F. Supp. 2d 226, 233 (E.D.N.Y. 2010) (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978)).  Here, the institutional defendant is CUNY; the individual defendants are all employees of that entity.  *See Ritzie v. City Univ. of New York*, 703 F. Supp. 271, 277–78 (S.D.N.Y. 1989) (dismissing Section 1985 claim against CUNY and individual defendants who were all employees of CUNY).  As such, the intra-corporate conspiracy doctrine applies, and the defendants are entitled to summary judgment as to the plaintiff's Section 1985 conspiracy claim. *Id.*

## IX.  Fourteenth Amendment Equal Protection Claim

Like Title VI and Section 1981, allegations of discrimination under the Equal Protection Clause "require that intentional discrimination be alleged in a non-conclusory fashion." *Clyburn v. Shields*, 33 F. App'x 552, 555 (2d Cir. 2002).  Therefore, the plaintiff's claims under the Equal Protection Clause also fail.

---

[43] Section 1985 provides a civil cause of action only when some other defined right has been violated; it creates no substantive rights. *Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 372 (1979); *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 587 (2d Cir. 1988).  In the present case, it is unnecessary to reach the question of which of the plaintiff's claims might be actionable under Section 1985 because, as discussed elsewhere, I hold that the plaintiff has not offered evidence sufficient to show that any of her defined federal rights have been violated.

## X.   Title VI Retaliation Claim

The plaintiff claims that she was barred from retaking NU202, dismissed from the nursing program, and Professor Rosa refused to change her test score—all in retaliation for engaging in protected activity under Title VI. "Retaliatory dismissal is actionable under Title VI." *Koumantaros*, 2007 WL 840115, at *10; *see also Davis v. Halpern*, 768 F. Supp. 968, 984 (E.D.N.Y. 1991). The plaintiff's retaliation claim is also analyzed under the *McDonnell Douglas* burden-shifting framework. *Borski v. Staten Island Rapid Transit*, 413 F. App'x 409, 410 (2d Cir. 2011). To state a *prima facie* case, the plaintiff must show: 1) that she engaged in protected activity; 2) that the defendant was aware of that activity; 3) that she suffered an adverse decision in pursuit of her education; and 4) that there was a causal connection between the protected activity and the adverse decision. *Koumantaros*, 2007 WL 840115, at *10 (citing *Davis*, 768 F. Supp. at 985). The plaintiff satisfies the first two requirements: she engaged in protected activity when she filed a complaint with QCC's Affirmative Action Office (AAO) on January 19, 2016,[44] and the defendants had notice of the action.

The defendants argue, and the plaintiff does not dispute, that the plaintiff cannot establish a causal connection between her January 19, 2016 complaint and any adverse action preceding that date. (Defs.' Mot. for Summ. J. at 19 (ECF No. 57); Pl.'s Mem. at 4 (ECF No. 77).) This means that neither the accusation of grade manipulation on the NU202 final exam nor the decision by the Grade Appeals Committee or Professor Menendez to deny the plaintiff's application to retake the NU202 course give rise to a claim of Title VI retaliation.

As a consequence of this chronology problem, the plaintiff tethers her Title VI retaliation claim to her March 8, 2012 meeting with Professor Rosa and Dean Paul Jean-Pierre, during

---

[44] The plaintiff does not dispute that this is the correct date for purposes of the Title VI retaliation analysis. Pl.'s Mem. at 4 (ECF No. 77).)

which they reviewed the plaintiff's exam, her answers, and the points she was assigned on the exam. The plaintiff asserts that Professor Rosa's refusal to change her test score constituted adverse action. This argument fails.

In the context of a retaliation claim, an "adverse action" is one that "well might have dissuaded a reasonable [person] from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54 (2006) (citation and internal quotation marks omitted); *see also Peters v. Molloy Coll. of Rockville Ctr.*, No. 07-cv-2553-DRH-ETB, 2013 WL 5652503, at *12 (E.D.N.Y. Oct. 16, 2013). Viewing the evidence in a light most favorable to the plaintiff, I conclude that the defendants did not take an adverse action for purposes of a retaliation claim.

The plaintiff has put forward no evidence tending to establish either that she actually passed NU202 or that Professor Rosa had the power to change her grade on March 8, 2012. Consequently, the plaintiff cannot establish that the purported adverse action—refusing to change the plaintiff's grade—would have dissuaded the plaintiff from making or supporting her charge of discrimination. As discussed previously, the plaintiff has put forward no evidence that she earned an initial unadjusted grade of 68.75 percent, rather than the 67.5 percent supported by her own Exhibit 3 and corroborated by the defendants' affidavits, deposition testimony, and other documentation. Further, the plaintiff concedes that it is the policy of the Nursing Department, as set forth in the handbook, that when a student fails a second course but wishes to continue in the nursing program, the student must submit an appeal to the Nursing Department's Grade Appeals Committee and request permission to retake the course. The plaintiff offers no evidence to suggest that Professor Rosa had the power unilaterally to change the plaintiff's grade

or to reverse the Grade Appeals Committee's decision denying the plaintiff the opportunity to retake NU202.

Nor has the plaintiff established that the defendants' legitimate, non-discriminatory reasons for declining to change her grade were pretext for discrimination. *See Koumantaros*, 2007 WL 840115, at *10 (if the plaintiff establishes a *prima facie* case for retaliation, the burden shifts to the defendant to show "a legitimate, non-retaliatory reason for the adverse action," and once the defendant has done so, the plaintiff can prevail on her retaliation claim "only if she can show that defendant's legitimate reason for the adverse action was in fact merely a pretext for retaliation"). Accordingly, I grant summary judgment in favor of the defendants on the plaintiff's Title VI retaliation claim.

### XI.    Fourteenth Amendment Due Process Claims

The plaintiff alleges that the defendants deprived her of a liberty or property interest in her nursing degree by a) "conducting a flawed investigation into Plaintiff's allegations of manipulation of grades;" b) "not giving her any reasons for the sudden change in her Teaching Project scores;" c) "not conducting any investigation into Plaintiff's complaints that she was discriminated on the basis of age, race and national origin;" and d) "attempting to shield the wrongdoings of its employees or agents." Compl. ¶ 68. The plaintiff argues that this deprivation purportedly violated her substantive and procedural due process rights guaranteed by the Fourteenth Amendment.

*1. Procedural Due Process*

A procedural due process claim is analyzed in two steps. First, the court "asks whether there exists a liberty or property interest which has been interfered with by the State," and second, the court "examines whether the procedures attendant upon that deprivation were

constitutionally sufficient." *Valmonte v. Bane*, 18 F.3d 992, 998 (2d Cir. 1994) (quoting

*Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)). As observed above, New

York law recognizes an implied contract requiring universities and colleges to deal with their

students in good faith. *See Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991). "Such an

implied contract, recognized under state law, provides the basis for a property interest that would

be entitled to constitutional protection." *Id.*

There is simply no evidence in the record to suggest that the process afforded to the

plaintiff by the defendants was constitutionally inadequate. The plaintiff raised an academic,

rather than a disciplinary, dispute. As such, there is no mandatory set of formal procedures

required for challenging the decision not to permit the plaintiff to continue in the nursing

program. *Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 89–90 (1978) (finding

that academic challenges require less formalized procedures than disciplinary determinations);

*cf. Goss v. Lopez*, 419 U.S. 565, 581 (1975) (in disciplinary proceedings a student must "be

given oral or written notice of the charges against him and, if he denies them, an explanation of

the evidence the authorities have and an opportunity to present his side of the story").

Academic institutions are afforded significant deference in setting the standards for

academic achievement. *Ward v. New York Univ.*, 2000 WL 1448641, at *3. This deference is

"rooted in the principle" that courts should not "substitute their judgments for those of the

educators" because "academic evaluations involve the subjective judgment of professional

educators." *Id.* In order for the public to have "complete confidence in the credentials dispensed

by academic institutions . . . it is essential that the decisions surrounding the issuance of these

credentials be left to the sound judgment of the professional educators who monitor the progress

of their students on a regular basis." *Rosenthal v. New York Univ.*, 482 F. App'x 609, 611 (2d

Cir. 2012). Courts may not intervene to require colleges "to confer diplomas on those who have been deemed to be unqualified." *Id.* (citation omitted).

Therefore, in reviewing the defendants' decisions, the Court is limited to determining whether the defendants "abided by their own rules, and whether they have acted in good faith or their action was arbitrary or irrational." *Id.* at 612. Viewed by this standard, the plaintiff has not established a genuine issue of material fact that the procedures afforded by QCC's nursing department, QCC's Office of Affirmative Action, and CUNY's Office of Student Affairs were constitutionally inadequate. QCC twice provided the plaintiff the opportunity to review her NU202 final exam on December 19, 2011 and again on March 8, 2011. The plaintiff was given the opportunity to appeal to the Grade Appeals Committee to retake the NU202 course. As discussed above, the Grade Appeals Committee's decision to deny the plaintiff's request was legitimate and non-discriminatory.

After the plaintiff's request to retake the course was denied, her claims of grade manipulation, unfair assignment of bonus points, and the Grade Appeals Committee's decision were investigated by both CUNY's Office of Student Affairs and QCC's Office of Affirmative Action. Both investigations found no evidence of grade manipulation and that the Grade Appeals Committee's decision was not arbitrary. Neither investigation uncovered any evidence of discriminatory intent. Though the plaintiff did not obtain the result she wanted, the process she was afforded was not constitutionally deficient. I grant the defendants' motion for summary judgment on the plaintiff's Fourteenth Amendment procedural due process claim.

*2. Substantive Due Process*

The substantive due-process guarantee "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Kia P. v.*

*McIntyre*, 235 F.3d 749, 758 (2d Cir. 2000). In determining whether a government regulation

infringes a substantive due process right, "the first step is to determine whether the asserted right

is 'fundamental.'" *Leebaert v. Harrington*, 332 F.3d 134, 140 (2d Cir. 2003). The Second

Circuit has repeatedly held that "[t]he right to public education is not fundamental." *Bryant v.*

*New York State Educ. Dep't*, 692 F.3d 202, 217 (2d Cir. 2012) (citing *Handberry v.*

*Thompson,* 446 F.3d 335, 352 (2d Cir. 2006)). Absent a showing of infringement of a

fundamental right encompassed in the substantive Due Process clause, the plaintiff's claim is

dismissed.[45]

## XII. *Monell* Liability

The defendants contend that the plaintiff's claims against CUNY should be dismissed

because "she cannot satisfy the *Monell* standard for municipal liability." (Defs.'s Mem. of Law

at 31–32 (ECF No. 57).) Even if the plaintiff were able to show that CUNY is a municipal

entity, *compare Clissuras v. City Univ. of New York*, 359 F.3d 79, 82 (2d Cir.) (CUNY senior

colleges are state actors), *with McKie v. Laguardia Cmty. Coll.*, No. 04-CV-5555-RRM-MDG,

2008 WL 4489796, at *3 n.3 (E.D.N.Y. Sept. 30, 2008) (community college that is part of the

CUNY system is a municipal entity), as discussed above, the plaintiff has not shown that she

suffered a deprivation of a constitutional right. *Fenner v. City of New York*, 392 F. App'x 892,

894 (2d Cir. 2010). I thus decline to consider the *Monell* rationale for dismissing the plaintiff's

claims.

---

[45] Even if the plaintiff's proposed "property interest gave rise to a substantive right under the Due Process Clause to continued enrollment free from arbitrary state action, the facts of record disclose no such action." *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214, 223 (1985).

### XIII. Remaining State Law Claims

The plaintiff's federal claims fail. I therefore decline to exercise supplemental jurisdiction over the plaintiff's state-law claims. *See* 28 U.S.C. 1367(c)(3); *see also In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir.1998) ("[The Second Circuit] and the Supreme Court have held that when the federal claims are dismissed the 'state claims should be dismissed as well.'").

## CONCLUSION

For the reasons set out above, the defendants' motion for summary judgment is granted. The plaintiff's complaint is dismissed in its entirety.

**SO ORDERED.**

s/Ann M. Donnelly

Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
April 20, 2016